# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

United States of America,                                      File No. 13-cr-253(1) (DWF/TNL)

                    Plaintiff,

v.                                                                        **REPORT &**
                                                                          **RECOMMENDATION**

Mustafa Ahmed Mohamed,
also known as Mustafa Mohamed Ahmed,

                    Defendant.

---

Bradley M. Endicott, Assistant United States Attorney, 316 North Robert Street, Suite 404, St. Paul, MN 55101; and Carol M. Kayser, Assistant United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Bruce M. Rivers, Rivers Law Firm, P.A., 701 Fourth Avenue South, Suite 300, Minneapolis, MN 55145 (for Defendant).

---

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Motion to Suppress Evidence Obtained by Search and Seizure (Docket No. 22), Motion to Suppress Statements (Docket No. 23), and Motion to Dismiss Count Two of Indictment on Grounds of Insufficient Allegations and Insufficient Evidence (Docket No. 33).

On March 3, 2014, a hearing was held on the motions. Assistant United States Attorney Bradley M. Endicott appeared on behalf of the United States (the Government). Bruce M. Rivers appeared on behalf of Defendant.

## I.

Based upon the file and documents contained therein, along with the testimony presented, the undersigned Magistrate Judge makes the following:

## FINDINGS

On May 29, 2013, Officer Matthew Schmidt, a six-year veteran of the Eden Prairie Police Department, was dispatched to an apartment building in response to a citizen complaint by a tenant regarding four African-American males smoking marijuana in the underground parking garage.  (Tr. at 22, Docket No. 40.)

When Officer Schmidt arrived, Officer Kevin Brown[1] was already inside the underground garage, speaking with a group of five individuals in front of a parked vehicle.  (*Id.* at 23.)  Officer Tyler Quesenberry arrived at the same time as Officer Schmidt and, together, they approached Officer Brown.  (*Id.* at 23, 24.)

Officer Schmidt observed Officer Brown talking with Defendant and instructing Defendant "to take his hands out of his pockets."  (*Id.* at 24, 40.)  Officer Schmidt noticed that Defendant "was looking around," "appeared nervous[,] and was fidgety."  (*Id.* at 24.)  Officer Schmidt characterized Defendant's demeanor as "above and beyond" the typical nervousness accompanying an interaction with a police officer and, in Officer Schmidt's experience, a person exhibiting such behavior "is planning on fighting or fleeing" from police.  (*Id.* at 24.)  Officer Schmidt heard Officer Brown instruct Defendant multiple

---

[1] The Government has included a copy of Officer Brown's report along with its memorandum in opposition to Defendant's motion to dismiss and motions to suppress.  (Gov't's Mem. in Opp'n at 4 n.1, Docket No. 46; Report of Officer Kevin Brown, Docket No. 46-1.)  This report was not introduced into evidence at the hearing and the Court has not considered it.

times to take his hands of his pockets, but Defendant continued to insert and remove his hands from the front pockets of his jacket. (*Id.* at 24.) Officer Schmidt then observed Officer Brown escort Defendant over to the adjacent parking stall, separating Defendant from the group. (*Id.* at 24.)

At the same time, another member of the group, later identified as Aydiid Isaak, split off and started walking away from the officers. Isaak was also "looking around" and Officer Schmidt believed Isaak was creating a distraction to inhibit Officer Brown from speaking with Defendant. (*Id.* at 25.) Isaak walked over to a nearby dumpster and began looking around and underneath the dumpster. (*Id.* at 26.) Isaak was instructed to stop, but continued walking away. (*Id.*) Isaak also began speaking to Defendant in a language that sounded like Somali. (*Id.*) Isaak was instructed "to not speak in another language." (*Id.*) When Isaak failed to comply with the officers' instructions, Officers Schmidt and Quesenberry moved in to restrain him physically. (*Id.* at 26, 27.)

Once Isaak was detained, Officer Schmidt then observed Officer Brown attempting to search Defendant. (*Id.* at 27.) Defendant began walking away from Officer Brown, who instructed him to stop and warned him that he would be TASERed if he did not stop. (*Id.*) Defendant continued walking away from Officer Brown and Officer Brown continued to command him to stop and warn him that he would be TASERed if he did not comply. (*Id.* at 28.) Defendant walked to an area between two parked vehicles. (*Id.*) Officer Schmidt moved over to the area between the parked vehicles and began walking between the vehicles towards Defendant and Officer Brown in order to assist Officer Brown. (*Id.*)

As Officer Schmidt walked towards Defendant, he observed Defendant crouch down close to the ground and place his hands near the front of his jacket. (*Id.*) The lighting in the underground garage was poor and Officer Schmidt was not able to see clearly what Defendant was doing with his hands when he crouched down. (*Id.* at 28-29; *see also id.* at 36.) After Defendant crouched down, Officer Brown TASERed him. (*Id.* at 29.) Once TASERed, Defendant placed his hands "up and out to the side," thereby submitting to law enforcement. (*Id.*)

Officer Schmidt subsequently handcuffed Defendant behind his back and "searched just the immediate area behind his back," focusing on just the area near Defendant's hands. (*Id.* at 29, 30.) Officer Schmidt then moved Defendant to a nearby stairwell. (*Id.* at 29.) After the scene was secure, Officer Schmidt conducted a more thorough pat-down of Defendant, searching for any weapons, guns, knives, or other objects that could harm officers. (*Id.* at 30.) In Defendant's left jacket pocket, Officer Schmidt found a handgun magazine containing at least one round of ammunition and a folding knife. (*Id.*) When placing Defendant in his squad car, Officer Schmidt "heard something drop" and Defendant remarked that something had fallen out of his jacket. (*Id.* at 31.) Officer Schmidt removed Defendant from the car and saw a nine-millimeter round on the car's floorboard, similar to the one in the magazine. (*Id.*)

A nine-millimeter handgun was also recovered at the scene. (*Id.*) The handgun was found underneath the vehicle next to which Defendant had been crouching when Officer Brown ordered him to stop. (*Id.*) Officer Schmidt testified that the handgun was capable of shooting the same rounds recovered from Defendant. (*Id.*) Officer Schmidt

4

testified that he believed that Defendant had removed the handgun from his jacket pocket and placed it underneath the vehicle while he was crouched down.  (*Id.* at 33, 36.) Officer Schmidt agreed that the handgun was "found within the wingspan or arm span of where [Defendant] was down on the ground."  (*Id.* at 44.)

At the hearing, there was no evidence indicating that Defendant was a tenant in the apartment building associated with the underground garage.  Additionally, Officer Schmidt was questioned on the manner in which the officers entered the underground garage and his observations upon entering.  (*Id.* at 33-34, 38.)  Officer Schmidt testified that he did not remember how the officers entered the underground garage for this particular incident.  (*Id.* at 38.)  Officer Schmidt did not ask permission from the apartment building's owner before entering, and the underground garage is not open to the general public.  (*Id.* at 44, 45.)  Officer Schmidt testified that officers typically have access to a "firebox key" with which they are able to retrieve keys for an apartment building and, for certain apartment buildings, officers are given entry codes in order to gain access.  (*Id.* at 38, 40; *see also id.* at 42.)  Officer Schmidt also testified that he has responded to a number of calls concerning this particular apartment building.  (*Id.* at 39, 41.)  Officer Schmidt explained that "[o]ur apartment underground garages are frequently hit by car tamper thieves" and officers are given field training on "how to gain access into the apartments."  (*Id.* at 39.)  Officer Schmidt testified that, "in [his] training and experience[,] the apartment management gives [officers] access to the buildings for the purpose of responding to calls of service."  (*Id.* at 40-41; *see also id.* at 42.)  Similarly,

Officer Schmidt testified that "[t]he apartment management wants us to have access to their building." (*Id.* at 42.)

In addition to his testimony referenced above, Officer Schmidt testified that he did not observe anyone smoking marijuana upon entering the building. (*Id.* at 34.) Officer Schmidt did not see anyone throw any marijuana cigarettes or find any marijuana on the ground. (*Id.*) Officer Schmidt also did not recall smelling marijuana in the garage. (*Id.* at 34-35.)

Finally, Officer Schmidt testified that, approximately one week later, Isaak came forward and said the handgun belonged to him and he had placed it underneath the vehicle. (*Id.* at 36, 44.) Isaak told Officer Schmidt that "he often hides his gun either under a vehicle or under a dumpster, and sometimes he would even bury it." (*Id.* at 37.)

## II.

Based upon the foregoing Findings, the undersigned Magistrate Judge makes the following:

## CONCLUSIONS OF LAW

### A. Motion to Dismiss Indictment

Defendant moves to dismiss Count Two (Felon in Possession of a Firearm) of the Indictment on the basis of insufficient allegations and insufficient evidence. (Mot. to Dismiss, Docket No. 33.) Defendant contends that "[t]here was no competent evidence presented to the Grand Jury upon which [C]ount [T]wo of the indictment is based on." (*Id.*) Defendant asserts that "[t]here is no evidence to support that [he] was in possession

6

of a firearm" and "evidence exists that [Isaak] by his own admission was the owner and possessor of the firearm in question." (*Id.*)

The Eighth Circuit has squarely rejected challenges to an indictment based on insufficient evidence: "It has long been settled that an indictment is not open to challenge on the ground that there was inadequate or insufficient evidence before the grand jury." *United States v. Nelson*, 165 F.3d 1180, 1182 (8th Cir. 1999); *see also United States v. Cady*, 567 F.2d 771, 776 (8th Cir. 1977) ("The Supreme Court has declined to adopt a rule permitting defendants to challenge indictments on the ground that they are not supported by sufficient or competent evidence.") (citing cases); *United States v. Hemme*, No. 13-cr-070(4) (JRT/LIB), ___ F. Supp. 2d ____, 2013 WL 6162799, at *2 (D. Minn. Nov. 25, 2013) ("The [Eight Circuit] has also expressly held that indictments may not be dismissed based on arguments that the evidence presented to the grand jury was insufficient.") (citing *Nelson*, 165 F.3d at 1182).  As the Supreme Court stated in *Costello v. United States*,

> [i]f indictments were held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed.  The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury.

350 U.S. 359, 408-09 (1956).  For this reason alone, Defendant's motion to dismiss Count Two of the Indictment should be denied.  *Nelson*, 165 F.3d at 1182.

In order to convict Defendant of being a felon in possession of a firearm, the Government must prove beyond a reasonable doubt that "(1) [Defendant] previously had

been convicted of a crime punishable by a term of imprisonment exceeding one year, (2) [Defendant] knowingly possessed a firearm, and (3) the firearm had been in or had affected interstate commerce." *United States v. Johnson*, 474 F.3d 1044, 1048 (8th Cir. 2007) (listing elements of offense under 18 U.S.C. § 922(g)(1)).

Defendant has essentially challenged the Government's ability to prove the second element by stating that there is no evidence to show that he was in possession of a firearm and the handgun in question belonged to someone else. The Government can prove the element of knowing possession, however, "with evidence showing [Defendant] had actual *or* constructive possession of the firearm." *Id.* (emphasis added). Further, "[p]ossession need not be exclusive, but instead may be joint." *Id.* at 1049. Thus, even if this Court were to accept Defendant's arguments that he did not *actually* possess the handgun and the handgun in fact belonged to Isaak, this Court cannot conclude that the Government is incapable of proving its case beyond a reasonable doubt as a matter of law given the availability of constructive possession and the non-exclusive nature of possession. *See Hemme*, 2013 6162799, at 3.

"The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c)(1). "An indictment is sufficient if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." *United States v. Summers*, 137 F.3d 597, 601 (8th Cir. 1998) (quotation omitted); *see also United States v. Prentice*, No. 09-cr-343(1) (DWF/RLE),

683 F. Supp.2d 991, 1004 (D. Minn. 2010).   The Indictment contains facts for each element of an offense under 18 U.S.C. § 922(g)(1), namely, Defendant has previously been convicted of a crime punishable by imprisonment for a term exceeding one year; Defendant knowingly possessed a firearm; and such firearm was in and affecting interstate commerce.   (Docket No. 1.)   Count Two of the Indictment is sufficient on its face.

Accordingly, Defendant's motion to dismiss Count Two of the Indictment should be denied.

### B.  Motions to Suppress Evidence

Defendant moves to suppress evidence obtained by search and seizure and any derivative evidence.   (Mot. to Suppress Evidence, Docket No. 22; Mot. to Suppress Stmts., Docket No. 23.)   Defendant contends that such evidence was obtained in violation of the Fourth Amendment, arguing the officers (1) did not have consent to enter the private, underground garage, and (2) lacked any particularized suspicion of criminal activity by Defendant to justify his detention and the search that followed.   Defendant also moves to suppress statements made during the course of his interaction with the officers in the underground garage.[2]

---

[2] Defendant does not claim that any statements made were the product of police interrogation or in response to any words or actions by the officers that they should have known were reasonably likely to elicit an incriminating response.  *See United States v. Turner*, 157 F.3d 552, 556 (8th Cir. 1998) ("Interrogation is express words or actions that the police should know are reasonably likely to elicit an incriminating response." (quotation omitted)).  The Eighth Circuit "ha[s] repeatedly held that a voluntary statement made by a suspect, not in response to interrogation is not barred and is admissible with or without the giving of *Miranda* warnings."  *Id.* (quotation omitted).  Because "[v]erbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search," however, the Court considers Defendant's motion to suppress statements in conjunction with Defendant's Fourth Amendment challenge.  *United States v. Craig*, 630 F.3d 717, 722 (8th Cir. 2011).

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  "Subject to a few narrow exceptions, a warrantless search or seizure violates the Fourth Amendment."  *United States v. Zamora-Lopez*, 685 F.3d 787, 789 (8th Cir. 2012).

## 1.  Underground Garage

The Government contends that Defendant lacks standing to challenge any search of the underground garage because Defendant has not shown that he possessed a legitimate expectation of privacy in the underground garage.  (Gov't Mem. in Opp'n at 6, Docket No. 46.)  Significantly, there is no evidence in the record that Defendant was a tenant of the apartment building in question.

"The Fourth Amendment protects the people against unreasonable searches of 'their' effects, and an accused in a criminal case may not assert the Fourth Amendment rights of a third party."  *United States v. Stringer*, 739 F.3d 391, 396 (8th Cir. 2014).  "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched."  *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994); *see also Stringer*, 739 F.3d at 396.  "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally."  *Gomez*, 16 F.3d at 256.

> Factors relevant to a determining whether defendant had a reasonable expectation of privacy include "ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of circumstances surrounding the search;

10

> the existence or nonexistence of a subjective anticipation of
> privacy; and the objective reasonableness of the expectation
> of privacy considering the specific facts of the case."

*United States v. Brown*, No. 07-cr-06 (JRT/JSM), 484 F. Supp.2d 985, 993 (D. Minn.

2007) (quoting *Gomez*, 16 F.3d at 256).

Defendant asserts that the officers did not have consent to enter the underground

garage.  (Def.'s Mem. in Supp. at 3, Docket No. 43.)  For Fourth Amendment purposes,

however, the "inquiry focuses on [Defendant's] expectations of privacy, not the propriety

of [the officers'] conduct."  *United States v. McGrane*, 746 F.2d 632, 634 (8th Cir. 1984).

Thus, whether the officers obtained consent prior to entering the underground garage,

were operating under some notion of implied authority based on their ability to access the

firebox, or surreptitiously entered the underground garage is irrelevant to the ultimate

inquiry of whether Defendant had a reasonable expectation of privacy in the underground

garage.

As for any reasonable expectation of privacy, Defendant recognizes that, as a

general matter, the common areas of an apartment building do not enjoy Fourth

Amendment protection.  (Def.'s Mem. in Supp. at 3.)  The Eighth Circuit "ha[s] rejected

the notion of a generalized expectation of privacy in the common areas of an apartment

building."  *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999).  Defendant also

has not argued that he is a tenant in the apartment building or otherwise leases a parking

stall in the garage.   Instead, Defendant argues that the underground garage is

distinguishable from other common areas because the "locked underground parking

garage [is] not meant for every tenant [and] accessible only by an assigned garage door

11

opener or other device."  (Def.'s Mem. in Supp. at 3-4.)  Additionally, Defendant argues

that, "[w]hile this parking garage is shared[,] there is no evidence that the parking garage

is open either to the public or to every resident of the apartment complex.  This exclusion

of others from the garage would leave one to have an expectation that their car parked

there would enjoy some level of privacy and protection."  (*Id.* at 4.)

      The Court concludes that Defendant has failed to meet his burden of proving that

he had a reasonable expectation of privacy in the underground garage.  As stated by the

Government, "there is no evidence indicating whether [Defendant] could exclude others

from the tenant garage, whether he took precautions to maintain privacy inside the

garage, whether he had a key or code to the apartment garage, or had the ability to exert

any kind of control whatsoever over the given area."  (Gov't Mem. in Opp'n at 7-8.)

*See McCaster*, 193 F.3d at 933 (no legitimate expectation of privacy where defendant

"failed to show any efforts to exclude others from the space, or any precautions to

maintain privacy" and other tenants and landlord also had access to space); *Gomez*, 16

F.3d at 256 (factors to consider in determining whether a reasonable expectation of

privacy existed); *see also United States v. Rucker*, 545 Fed. App'x 567, 570-71 (8th Cir.

2013) (no expectation of privacy where defendant "did not show a 'possessory interest'

in the shared common area or that he had a means to exclude others from that space").

"To hold otherwise would allow a criminal to keep contraband from the legitimate reach

of law enforcement by the simple act of storing it in a shared common area."  *McCaster*,

193 F.3d at 933.

Further, "[a]n expectation of privacy necessarily implies an expectation that one will be free of any intrusion, not merely unwarranted intrusions." *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977). While the underground garage was generally secured against entry by the public, these measures "were to provide security to the occupants, not privacy in common [areas]." *Id.* The common, underground garage was accessible to tenants of the building, their guests, the building's management, and "others having legitimate reasons to be on the premises." *Id.*; *see also McCaster*, 193 F.3d at 933. Even assuming the officers entered the underground garage without consent, Defendant did not have a reasonable expectation of privacy in this common, shared space. *See Eisler*, 567 F.2d at 816.

Because Defendant has not shown that he had a reasonable expectation of privacy in the underground garage, Defendant lacks standing to challenge any search of the garage and his motion to suppress the evidence found therein should be denied.

### 2. *Terry* Search

Defendant also contends that his detention by the officers was unlawful because they did not have any particularized suspicion that Defendant was engaged in criminal activity. Defendant challenges his detention based on his interactions with Officer Brown. (Def.'s Mem. in Supp. at 5.) The Government focuses on Defendant's interactions with Officer Schmidt. (Gov't Mem. in Opp'n at 9-10.) The Court will consider each set of officer interactions in turn.

### a. *Terry* Standard

The stop-and-frisk exception is one of the exceptions to the Fourth Amendment's warrant requirement. *United States v. Woods*, No. 12-3924, ___ F.3d ____, 2014 WL 1282292, at *2 (8th Cir. Apr. 1, 2014) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "'[A]n officer may, consistent with the Fourth Amendment conduct a brief investigatory stop when the officer has a reasonable articulable suspicion that criminal activity is afoot." *United States v. Cotter*, 701 F.3d 544, 547 (8th Cir. 2012) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "A reasonable suspicion is a particularized and objective basis for suspecting criminal activity by the person who is stopped." *United States v. Hightower*, 716 F.3d 1117, 1119-20 (8th Cir. 2013) (quotation omitted). "In determining whether reasonable suspicion exists, [courts] consider the totality of the circumstances in light of the officers' experience and specialized training." *United States v. Preston*, 685 F.3d 685, 689 (8th Cir. 2012) (quotation omitted).

Moreover,

> if the officer reasonably believes the person with whom he is dealing is armed and dangerous, he is permitted to conduct a protective search of the person's outer clothing, and any weapons seized as a result of such a search "may be properly introduced into evidence against the person from whom they were taken."

*Cotter*, 701 F.3d at 547 (quoting *Terry*, 392 U.S. at 30-31). "[S]uch a search requires more than an officer's inchoate and unparticularized suspicion or hunch. . . [and] the officer conducting the search must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that

intrusion." *Id.* (quotations omitted).  Yet, "'[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man under the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Id.* (quoting *Terry*, 392 U.S. at 27).  "If, however, the officers conduct an illegal search or detention, the physical evidence from the search as well as verbal evidence obtained from the detention must be excluded as the 'fruits' of the officers' unlawful action." *Id.*

### b.  Officer Brown

Defendant simply asserts that because "the Officer cannot identify any particularized suspicion of criminal activity[,] . . . .  Officer Brown's detention of the Defendant was illegal and the search and arrest that resulted therefrom is illegal."  (Def.'s Mem. in Supp. at 5.)  "While reasonable suspicion must be more than an inchoate hunch, the Fourth Amendment only requires that police articulate some minimal objective justification for an investigative stop." *United States v. Farnell*, 701 F.3d 256, 261 (8th Cir. 2013).  In this case, officers were dispatched to the underground garage following a citizen complaint of a group of individuals smoking marijuana in the garage.  "[T]he caller's paucity of detail did not relieve officers of their duty to investigate." *United States v. Lawhorn*, 735 F.3d 817, 821 (8th Cir. 2013).  Defendant was among a group of individuals in the garage when Officer Brown approached.   During Defendant's interaction with Officer Brown, Defendant was looking around, appeared overly nervous, and fidgety.  Defendant continued inserting and removing his hands from his pockets during this time despite multiple, explicit commands from Officer Brown to take his

15

hands out of his pockets.  Officer Schmidt testified that, in his experience, these sorts of behaviors are exhibited by individuals who are planning on fleeing from or fighting with law enforcement.  *See United States v. Benson*, 686 F.3d 498, 502 (8th Cir. 2012) (noting "[v]arious behaviors and circumstances can contribute to, or be sufficient to provide, reasonable articulable suspicion" (quotation omitted)).  Finally, when Officer Brown removed Defendant from the group, another member of the group – Isaak – began walking away from the group, looking around, and failing to obey officer instructions to stop.  *See Preston*, 685 F.3d at 690 (group member's attempt to create a distraction contributed to officer "suspicion that criminal activity was afoot and might present a threat to officer safety").

Based on the totality of the circumstances, the Court concludes that Officer Brown had reasonable suspicion that Defendant was engaged in criminal activity sufficient to warrant an investigatory stop.  *See Lawhorn*, 735 F.3d at 521 (reasonable suspicion existed where, upon responding to call about potential robbery, officers found car matching caller's description and occupant looked at officers "wide-eyed and reach[ed] quickly into backseat").

### c.  Officer Schmidt

In addition to his observations of Defendant's interaction with Officer Brown and the subsequent distraction facilitated by Isaak, Officer Schmidt then observed Defendant walk away from Officer Brown despite Officer Brown's commands to stop and warnings that Defendant would be TASERed if he did not comply.  Defendant persisted in his defiance of Officer Brown's orders and, as Officer Schmidt approached, moved into an

area with poor lighting, crouching down to obstruct the officers from having a clear view of what he was doing. Officer Schmidt was only able to see that Defendant continued to place his hands near his front pockets—the same pockets from which Officer Brown had previously instructed Defendant to remove his hands. Defendant only submitted once the TASER was deployed. On top of what Officer Schmidt had already witnessed, Defendant's additional non-compliance and furtive gestures provided ample justification for Officer Schmidt to be concerned for his own safety and that of his fellow officers, warranting pat-down searches for weapons both rapidly during the initial handcuffing of Defendant and more thoroughly once the scene was secure. *See Cotter*, 701 F.3d at 547; *Preston*, 685 F.3d at 689.

In sum, Officers Brown and Schmidt had reasonable articulable suspicion that Defendant was engaged in criminal activity and may be armed, thereby presenting a threat to the individual officers and others in the area. Therefore, the officers were justified in performing an investigatory stop and protective searches of Defendant without a warrant. Because the officers did not violate Defendant's Fourth Amendment rights, Defendant's motion to suppress evidence and statements obtained from the stop and subsequent searches should be denied.

[Continued on next page.]

## III.

Based upon the foregoing Findings and Conclusions, the undersigned Magistrate

Judge makes the following:

### RECOMMENDATION

For the reasons set forth herein, **IT IS HEREBY RECOMMENDED** that:

1.  Defendant's Motion to Dismiss Count Two of Indictment on Grounds of Insufficient Allegations and Insufficient Evidence (Docket No. 33) be **DENIED**.

2.  Defendant's Motion to Suppress Evidence Obtained by Search and Seizure (Docket No. 22) be **DENIED**.

3.  Defendant's Motion to Suppress Statements (Docket No. 23) be **DENIED.**

Date: April __10__, 2014                    _____*s/ Tony N. Leung*_____
                                            Tony N. Leung
                                            United States Magistrate Judge
                                            for the District of Minnesota

                                            *United States v. Mohamed*
                                            File No. 13-cr-253(1) (DWF/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **April 25, 2014**.